AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
1/24/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAV _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
January 24, 2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CLD _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No.   2:23-mj-00286-DUTY |
| DAVID ANTHONY CRAMER, | |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 27, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Robert Castruita*
_____
*Complainant's signature*

Robert Castruita, FBI Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   January 24, 2023

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT**

I, Robert Castruita, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrant against David Anthony CRAMER ("CRAMER") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2.     This affidavit is also made in support of an application for a warrant to search the person of CRAMER, as described more fully in Attachment A.

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances); 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. § 922(g)(1) (felon in possession of firearm/ammunition); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"). I have been a police officer for the City of Los Angeles for approximately 15 years.  I am currently assigned to the Harbor Area Narcotics Enforcement Detail.  I began my career in July of 2005 by attending the Los Angeles Police Academy.  While in the academy I received training in the identification and recognition of various drugs and narcotics, including cocaine, rock cocaine, methamphetamines, marijuana, PCP, heroin, and various other controlled substances.

6.    I have also received field training from field training officers with regards to the possession, use, packaging, and sales of cocaine, rock cocaine, methamphetamines, marijuana, PCP, heroin, and various other controlled substances to include prescription narcotics.  I have received training from senior narcotics investigators and have participated in over 1,000 narcotic related investigations.  I have participated in T-III wire-tap investigations that targeted narcotic dealers and have also watched videos depicting the manufacturing, cultivation, cutting, packaging, transportation, sales, and ingestion of various controlled substances.  I have testified in the California Superior Court as a narcotics expert.

7.    Through interviews and investigations, I have learned about other crimes associated with narcotics trafficking such as possession of firearms in aid of drug crimes, firearms sales or trades for narcotics, and firearms trafficking.  I have authored numerous search warrants that have resulted in the seizure of narcotics, firearms, currency as well as other evidence associated with the trafficking of narcotics.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my training and experience, my review of investigative reports, my participation in this investigation, and my conversations with other law enforcement officers regarding the investigation, I know the following information.

**A.    Background of Investigation**

9.    In December 2020, the Los Angeles Police Department ("LAPD") and the FBI initiated an investigation into drug trafficking organizations operating out of the Harbor Area of Los Angeles, California.  As part of the investigation, LAPD and FBI are targeting gang "shot-callers" and influential members of numerous street gangs, including the Rancho San Pedro ("RSP") gang, whose members are believed to be involved in a host of illicit activities including drug trafficking, weapons trafficking, assaults, and other violent acts.  Through undercover controlled purchases for narcotics and/or firearms as well as other investigative methods, this investigation has identified numerous prominent members of the RSP gang, including CRAMER, also known as "Little Man."

**B.    CRAMER Sells Approximately 26 Grams of Pure Methamphetamine to Confidential Informant**

10.    On or about April 27, 2021, LAPD instructed a Confidential Informant ("CI")[1] to buy methamphetamine from the area near the intersection of 11th Street and Alma Street in San Pedro, California.  Investigators knew this area to be a location where RSP members sell narcotics.  Before the deal, law enforcement searched the CI for contraband with negative results, provided the CI with $500 in pre-recorded United States currency, and outfitted the CI with audiovisual recording equipment, which captured the CI's interactions.  Law enforcement then continuously surveilled the CI and live-monitored the CI's audio feed.

11.    A short time after arriving at the designated location at approximately 9:20 p.m., the CI made contact with CRAMER and asked to purchase methamphetamine from him.  At the time, CRAMER was standing next to a silver Toyota bearing California License Plate 8UMC648 that was registered to CRAMER.  CRAMER directed the CI to wait to the side.  A short time later, CRAMER asked the CI what kind of drugs s/he wanted and the CI stated s/he wanted a "zip" (street vernacular for an ounce of methamphetamine).  CRAMER then instructed the CI to get into his silver Toyota.

---

[1] The CI is cooperating with law enforcement in exchange for financial consideration.  The CI has worked for LAPD for approximately 5 years and has been paid approximately $35,000 over the course of the CI's cooperation.  The CI has earlier criminal convictions for burglary, grand theft, possession of a controlled substance, possession of drug paraphernalia, driving with a suspended license, and theft.

12.   Once inside the vehicle, CRAMER told the CI he was armed with a "9" (common term used for a 9mm caliber firearm), and then asked the CI if the CI had the money.  CRAMER told the CI that his "homie" lived nearby and again asked the CI what the CI wanted.  The CI again replied that the CI wanted a "zip."

13.   CRAMER then called a male source of supply in the CI's presence.  CRAMER asked the source if he could get a "zip," and asked for the price.  The source told CRAMER that he would sell an ounce for $200.  When CRAMER asked if he could get one ounce, the source replied "yup."

14.   CRAMER then turned to the CI and asked, "you cool right, you straight?"  CRAMER then told the CI that he wasn't trying to get in trouble, he wasn't going back to jail because he had done nineteen years straight.  CRAMER also told the CI that he would let "loose," he didn't give a fuck, the CI would be going down too, because if CRAMER got busted he would be doing life in prison.[2]

15.   A short time later, CRAMER had another phone call with his source of supply in the CI's presence.  CRAMER asked, "how much," and the supplier said, "I told you 150, 175."  The CI offered to pay $200 for the methamphetamine and give $20 to CRAMER for facilitating the deal.  CRAMER asked the CI for the money and demanded $30 from the CI for facilitating the deal. The CI then gave CRAMER $230 in pre-recorded government funds.

---

[2] I later reviewed CRAMER's criminal history which included a felony conviction for Carjacking, in violation of California Penal Code Section 215, in March 1997.  For this conviction, CRAMER was sentenced to 23 years in state prison.

16.   Investigators then saw CRAMER move his silver Toyota to the south side of 11th Street.  A short time later, CRAMER and the CI got out of the car and walked towards an apartment building located at 966 West 11th Street.  CRAMER and the CI then waited outside of the building.

17.   A short time later, investigators saw CRAMER enter the building where he remained for approximately 10 minutes, while the CI waited outside of the building.  CRAMER then exited and returned to his vehicle with the CI.  CRAMER began driving the vehicle eastbound.  While CRAMER drove, he handed the CI a clear plastic bag containing a crystalline substance later confirmed by DEA laboratory testing to be approximately 24.5 grams of pure methamphetamine.

18.   CRAMER drove to a VONS grocery store located at 1221 South Gaffey Street, San Pedro, California, and dropped off the CI before driving away.  Investigators directed the CI to meet them at a pre-determined location where the methamphetamine was recovered and a search was conducted of the CI with negative results.

19.   After investigators observed the CI being dropped off by CRAMER, they asked LAPD officers to conduct a traffic stop of CRAMER in his silver Toyota due to the fact that he was believed to be armed with a firearm.  A traffic stop of CRAMER's silver Toyota was conducted and CRAMER was detained.  Upon being detained, investigators observed a black steel handgun on the front passenger floor board of the Toyota.  The item was recovered and determined to be a BB gun.  A search of CRAMER was

conducted and officers recovered a rolled dollar bill containing approximately 0.056 grams of methamphetamine.

20.  During the search, investigators also recovered $30 from CRAMER's front sweatshirt pocket and LAPD Detective Hayes confirmed that the money in CRAMER's pocket matched the serial numbers of the pre-recorded buy money that law enforcement had given to the CI to purchase drugs.  The money was verified and returned to CRAMER to preserve the integrity of the investigation.  During the detention of CRAMER, a field show-up was conducted with the CI and the CI positively identified CRAMER as the person who had sold the CI methamphetamine.

21.  I have reviewed the CI's audiovisual recording of the methamphetamine deal with CRAMER.  The video clearly shows CRAMER's face and captures his voice.

**C.    Law Enforcement Searches CRAMER's Residence and Recovers Ammunition**

22.  On or about April 11, 2022, the Honorable Pedro V. Castillo, United States Magistrate Judge, signed a search warrant for CRAMER's residence located at 432 West 10th Street, San Pedro, in case number 2:22-mj-01457.  When executing the search warrant the next day, April 12, 2022, investigators located 5 rounds of Winchester 9mm ammunition as well as other rounds of ammunition in a detached storage shed behind CRAMER's residence.  Agents spoke with CRAMER's wife, R.S., who was present during the search warrant and stated that everything in the shed belonged to CRAMER, including the ammunition.

## III. TRAINING AND EXPERIENCE ON DRUG OFFENSES

23.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal
activity.

       h.   It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

### IV. TRAINING AND EXPERIENCE ON DRUG TRAFFICKERS' POSSESSION OF FIREARMS AND AMMUNITION

    24.   Based on my training, experience, and information and
the collective experiences related to me by other law
enforcement officers who conduct drug trafficking and firearms
investigations, I am aware that drug traffickers often possess
firearms in order to protect themselves, their drugs, and the
proceeds of their drug dealing from robbery.  Because drug
traffickers are engaged in illegal activity, they cannot rely on
the protection of law enforcement to safeguard their valuable
property, including controlled substances and cash proceeds of
drug trafficking.  Accordingly, drug traffickers often obtain
firearms and/or ammunition as a means to safeguard their persons
and property given the risks of robbery by customers,
competitors, or others who would seek to acquire their drugs or
money.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

       28. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CRAMER's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CRAMER's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

       29. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

30.   For all of the reasons described above, there is probable cause to believe that CRAMER has committed a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of CRAMER's person as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>24TH</u> day of January, 2023.

_____
UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR